Howard T. Hogan, J.
This is a special proceeding brought pursuant to section 25 of the General Corporation Law which seeks an order nullifying the election of officers of the Long Island Home Builders Institute, Inc., which took place at the annual meeting on November 20, 1957.
Specifically the election of Charles Mascioli to the office of president is attacked on the ground that he is not a builder-member of the Institute and that under the by-laws he is thus not eligible to hold the office. The election of Bernard Krinsky to the office of first vice-president is questioned on the ground that he was in arrears in his dues, not in good standing and thus not eligible to assume the office. The whole election is attacked because of a failure to give notice to the entire membership of the organization of the meeting and of the election to take place thereat. Although there were 19 offices to be filled at the meeting only 6 were contested. This was later reduced *394 to 5 by withdrawal of Mr. Gilman, the petitioner in this proceeding, as a candidate for the office of treasurer.
While the hearing in this matter consumed three full court days, at which both the petitioner and the intervenors-respondents developed a great deal of detailed testimony on the issues as they conceived them to be, it seems to the court that the problem can be reduced to two comparatively simple questions: (1) Was Charles Mascioli a builder-member of the Institute at the time of the election? (2) Was a notice sent to each person who was entitled to a notice of the election meeting?
The question as to Charles Mascioli’s membership arises in this way. Prior to 1953, his father, Joseph Mascioli, who was building under the name of Clearview Village, Inc., had joined the Institute. In that year due to ill health, he decided to resign and sent in his resignation in writing. The executive director of the Institute attempted to dissuade him and finally in 19.55 it was arranged to have his son, Charles Mascioli, take his place as the builder-member representing Clearview Village, Inc. Tie paid up his back dues in the amount of $2,069 and since that time Charles Mascioli has been accepted by everyone having any legitimate concern in this matter as the builder-member for Clearview Village, Inc, He has been billed for dues as a member, paid them, served on various committees and even been elected to the board of directors of the Institute for a three-year term, which latter office under section 2 of article XI of the by-laws, requires him to be a builder-member just as section 1 (a) of article XIII requires that the president be elected from the active builder-membership by the builder members.
In the face of this it would be extremely inequitable to hold that .the technical defect in his membership of having failed ■to file a formal application now disqualified him from holding office. This is especially true since it was conceded by .the executive vice-president, Bobert S, Hunt, who., as the chief administrative officer of the respondent, testified that according to the practice in vogue, such an application, had it been filed, would have been accepted as a matter of course and would have required no affirmative action either by the admissions committee or by the board .of directors, as is ordinarily the ease with a new member.
Therefore, the filing of an application by Charles Mascioli under these circumstances was a pro forma matter, without substance or significance and thus I hold that he was eligible for office and will be eligible for future -office at the new election, which for the reasons hereinafter indicated, I deem it necessary to order.
*395 That brings us to the second question re: the adequacy of the notice of meeting given to the membership.
It appears that the official membership records of the Institute are the accounting records. These consist of a metal file drawer containing cards for each member alphabetically arranged and some ledgers showing a statement of their accounts.
The front part of the drawer has two divisions (1) Nassau builder-members A-Z, followed by (2) Queens builder-members A-Z. There then follows four groups of cards which are designated (1) closed, (2) resignations pending, (3) in hands of attorney for collection, and (4) removed. The significance of these divisions is as follows: Drawers of addressograph plates are kept current with the first two divisions only, i.e., with the Nassau and Queens builder-members. As soon as a member is moved to one of the other four files, his plate is destroyed.
Since all mass mailings, including the notice of annual meeting which concerns us on this application, are controlled by this plate system, if one is not in the front of the drawer, he receives no notice.
The proof shows that prior to sending the notice for the meeting of November 20, 1957, 146 builder-member cards had been moved to the back. We need not concern ourselves with 94 who were closed, had resignations pending or were in the hands of attorneys for collection. The fact is that there were over 40 builder-members whose cards had been moved solely because they were delinquent in their dues. This contrasts with 84 other members who were likewise delinquent in their dues, but whose cards were left undisturbed and who thus received notice of the annual meeting. There appears to have been no line of demarkation between these groups of 40 and 84, based upon either the amount or time of delinquency, and they overlapped in this respect. Actually, their status was determined by the executive director acting on his own, his chief determinant having been his estimate of their “ salvagability ”.
The only automatic penalty for dues delinquency, according to the by-laws, is a 25% increase after 90 days. This.is set forth in article 9, section 2 (a) (6). In addition, the executive committee is vested with discretion to “ take such action as it may deem necessary and desirable to collect the said dues and enforce the payment thereof.”
There is no testimony that the executive committee ever authorized the shifting of these names to the back of the drawer or adopted any other penalty for the nonpayment of dues, either *396 for this group of 40 or any other group. In fact the testimony is to the contrary.
Since the executive committee consists of rather a large group of officers as set forth in section 1 of article XIV, it is apparent that the executive director, acting by himself, had no authority to suspend a member for nonpayment of dues, terminate notices to him or impose any other penalty in a matter already specifically covered by the by-laws and this fact he admitted in his own testimony.
The testimony shows that under the practice prevailing at the Institute, any one of these 40 odd contained in the 146 could have cleared up his back dues at any time and voted. In fact, two persons in the selfsame situation, Murray Eosenblum and Noah Greenspan, although not in the 146 because they had cleared their arrears before the 146 count was taken, had had their mailing plate destroyed and then restored after payment of back dues.
There was no legally valid reason for treating the 84 delinquent members one way and the other 40 delinquent members another. To say that the notice to the 84 was gratutious and unnecessary begs the question. It was not necessary, if they were members and according to the by-laws they still were. Anything which may be said of them applies with equal force to the 40.
Since there is to be another election, a word about those eligible to vote will be in order.
Section 1 of article XVI, provides that “ only builder members in good standing shall have the right to vote.” There is no definition of what is meant by the term “ good standing ” elsewhere in the by-laws. I do not think that it can be said as a matter of course that this expression is equivalent to non-delinquency in dues, because if that was all that was meant, it would have been simple to say so.
I would think that in the future the ■ executive committee under the broad powers given in article 9 might very well decree that delinquency for a certain time, or in a certain amount, would have the effect of suspending a member’s good standing and thus his right to vote, but in the absence of some such tie-in, it is left largely ineffective and meaningless.
However, in view of the fact that this is an internal fight between an insurgent group and an entrenched group who are presently in control of the executive committee, in order to obviate any charge of bias or unfairness, I hold that for this election, all builder-members, except those in the categories “ closed ”, “resignation pending ” and “ In hands of attorney, *397 etc.”, in good standing and eligible to vote and that a notice of election advising them of their right to vote be sent to all of them.
Since the by-laws of the National Association of Home Builders provide for a carry over of the delegates to the national convention from year to year until their successors are elected and since arrangements have been made for the interim management of the Institute until this matter is decided, the stay will be continued pending the new election.
Settle order.